**UNITED TRANSPORTATION UNION, Plaintiff,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Southern Railway Company, and Interstate Railroad Company, Defendants.**

No. Civ. A. 85–3410.

United States District Court, District of Columbia.

Nov. 29, 1985.

Wm. G. Mahoney, John O'B. Clarke, Jr., Highsaw & Mahoney, Washington, D.C., for plaintiff.

Jeffrey S. Berlin, Russell E. Pommer, Mark E. Martin, Donna L. Isaacks, Verner, Liipert, Bernhard, McPherson & Hand, Washington, D.C., Wm. P. Stallsmith, Jr., Norfolk, Va., for defendants.

## MEMORANDUM OPINION AND ORDER

THOMAS F. HOGAN, District Judge.

United Transportation Union ("UTU") filed a complaint for declaratory and injunctive relief with this Court on October 25, 1985. The complaint sought review and the setting aside of an arbitration award ("the Award") issued on September 25, 1985, in favor of the defendants, Norfolk and Western Railway Company ("N & W"), Southern Railway Company ("Southern") and Interstate Railroad Company ("Interstate"). A three-member Arbitration Panel

("the Panel"),[1] selected by the National Mediation Board ("NMB") in response to a petition of the defendants and an Interstate Commerce Commission ("ICC" or "the ICC") notice, had issued the Award. The Award authorized the November 1, 1985 effectuation of an April 17, 1985 document that was designed to implement three ICC-approved consolidation proposals[2] of the defendants. The Panel had characterized said document as a tentative implementing agreement reached by the parties after considerable arbitration. UTU had, however, objected to the arbitration proceedings from their inception, and presently controverts the ICC's characterization. In its complaint, UTU contends that, by forcing UTU to arbitrate and by abrogating certain employee protective conditions of twenty-seven UTU members during said arbitration, the defendants have violated several provisions of the Railway Labor Act ("RLA" or "the RLA"), 45 U.S.C. § 151, *et seq.* As a result, UTU argues that the Award must be declared invalid and set aside.

The Court granted UTU's application for a temporary restraining order on October 31, 1985, after conducting a hearing in which counsel for the defendants participated fully. That order enjoined the defendants from placing into effect the controversial implementing agreement until the Court could conduct a hearing on UTU's motion for a preliminary injunction on November 14, 1985. In response to a subsequent request of the parties, the Court continued said hearing and extended the temporary restraining order until November 21, 1985, so that the parties could properly brief the numerous legal issues involved in this case.

At the preliminary injunction hearing, the Court focused chiefly on the motion of defendants to dismiss the complaint as to Southern for lack of subject matter jurisdiction.[3] In addition, the Court addressed defendants' motion as to both N & W and Interstate for lack of personal jurisdiction and for improper venue. Finally, the Court questioned counsel for the parties briefly about the merits of UTU's motion for a preliminary injunction: in particular, counsel were required to discuss the likelihood of UTU's success on the merits of the case.

After obtaining the consent of the parties to extend the temporary restraining order until it could render a memorandum opinion and order, the Court took the matter under advisement. Having evaluated the substantial papers filed and lengthy argument conducted in this case, the Court has concluded that in several respects it lacks subject matter jurisdiction and in other respects it would be inappropriate to address UTU's complaint as to *all* of the defendants. The complaint must therefore be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.[4] Accordingly, the Court declines to comment on the issues of in personam jurisdiction and venue where N & W and Interstate are concerned, and will not address the merits of UTU's preliminary injunction motion.

### Factual Background

UTU is an unincorporated labor organization. It is a "representative" as that term is used in the RLA, 45 U.S.C. § 151, *et seq.*

Defendant N & W is a Virginia corporation engaged in the transportation of property and goods by rail in interstate commerce; and, as such, N & W is a "carrier"

---

1. The Panel consisted of the following people: a Neutral Referee, Robert J. Ables; the Director of Public Relations for Southern, David N. Ray; and the Vice President of UTU, L.W. Swert. Mr. Swert objected to the Award, and filed a dissenting opinion.

2. Finance Docket No. 30582.

3. In the alternative, defendants moved to dismiss the complaint as to Southern for failure to

state a claim upon which relief could be granted. Fed.R.Civ.P. 12(b)(6).

4. Although defendants have moved to dismiss the complaint as to Southern only, the Court must dismiss the complaint *in toto* when it *"appears ... that the court lacks jurisdiction over the subject matter."* Fed.R.Civ.P. 12(h)(3) (emphasis added).

within the meaning of the RLA and a "common carrier" subject to the Interstate Commerce Act ("ICA" or "the ICA"), 49 U.S.C. § 10101, *et seq.* Defendant Southern is a corporation, whose state of incorporation has not been made clear to the Court,[5] engaged in the transportation of property and goods by mail in interstate commerce; and, as such, it is also a carrier and common carrier subject, respectively, to the RLA and the ICA.

Defendant Interstate, twenty-seven of whose employees will allegedly be injured by the implementation agreement in question, is incorporated in Virginia. In addition, it is a wholly-owned subsidiary of Southern, and is also subject to both the RLA and the ICA. All three defendants are controlled by Norfolk Southern Corporation ("NSC"), whose state of incorporation is not known by the Court.[6]

As a result of an earlier transaction approved of by the ICC in *Norfolk Southern Corp.—Control—Norfolk & W. Ry. Co.,* 366 I.C.C. 171 (1982), N & W, Southern, and Interstate were consolidated as "mechanical services." On November 5, 1984, N & W and Southern petitioned ICC (Finance Docket No. 30582) for an exemption under 49 U.S.C. § 10505 ("Authority to exempt rail carrier transportation")[7] from the prior review requirements of 49 U.S.C. § 11343 ("Consolidation, merger, and acquisition of control"), to enable N & W to operate under contract the properties of Interstate. Concurrently, Interstate sought a similar exemption from the prior review requirements of 49 U.S.C. § 10901 ("Authorizing construction and operation of railroad lines"), so that it could construct "connecting tracks at Norton and Tacoma, Virginia"; and, finally, N & W sought an exemption from the same provision in order to conduct N & W operations over an addi-tional 2.3 miles of Southern's lines in southwestern Virginia.

UTU contends that, in their three-exemption petition, the defendants "stated in detail the manner in which they proposed to effectuate their contemplated transaction, *including their intentions to alter seniority rights and to unilaterally [sic] select the forces to perform certain operations."* *Complaint,* at 4 (emphasis added). Thus, in response to the defendants' petition, UTU, and the Railway Labor Executives' Association ("RLEA"), filed a letter of protest with the ICC.

In mid-January, 1985, the defendants notified various UTU representatives of the carriers' respective employees that NSC, the parent corporation, intended to "coordinate and/or consolidate track and engine service, forces and seniority rosters on the Interstate and ... [N & W]" in connection with the November 5, 1984 exemptions petition pending before the ICC. This notice was served on UTU pursuant to Article I, Section 4 of the employee protective conditions set forth in *New York Dock Ry.— Control,* 360 I.C.C. 60, *aff'd, New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979). *See infra* note 8 and p. 9. Reluctantly, UTU participated in negotiations with the defendants during late January, late February, and mid-April of 1985. Although the Panel would later characterize an April 17, 1985 document as a "tentative implementing agreement," UTU maintains that "[t]hese conferences failed to produce an implementing agreement acceptable to all the parties." *Complaint,* at 5.

Meanwhile, on February 19, 1985, ICC issued a "Notice of Exemption" under 49 U.S.C. § 10505 that exempted from prior ICC review the "contract to operate" and "acquisition of trackage rights" proposals

---

**5.** Southern has conceded, however, that it does business in the District of Columbia.

**6.** Defendants concede, however, that NSC does business in the District of Columbia.

**7.** 49 U.S.C. § 10505(a) provides in pertinent part: "[the ICC] shall exempt ... a transaction or service because of the limited scope of the transaction or service, *when the ... [ICC] finds that the application of a provision of this subtitle —(1) is not necessary to carry out the transpor*tation policy of ... [49 U.S.C. § 10101]." (Emphasis added). 49 U.S.C. § 10505(g) provides in pertinent part: "[the ICC] may not exercise its authority under this section ... (2) to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle."

petitioned for by the respective defendants in November of 1984. In its decision, ICC stated that the exemptions were warranted, because N & W, Southern, and Interstate were already members of the same corporate family (*i.e.*, that of NSC), so that the approved transactions would not result in changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family. *See* 49 U.S.C. § 10101; 49 C.F.R. § 1180.2(d)(3). ICC's exemption order required, however, as follows:

> As a condition to use of this exemption, *any employees affected* by N & W-Southern contract to operate the properties of Interstate will be protected pursuant to *Mendocino Coast Ry., Inc.— Lease and Operate*, 354 I.C.C. 732 (1978) and 360 I.C.C. 653 (1980). *Any employees affected* by N & W's acquisition of trackage rights over Southern will be protected pursuant to *Norfolk and Western Ry. Co.—Trackage Rights—BN*, 354 I.C.C. 605 (1978), as modified in *Mendocino Coast, supra,* 360 I.C.C. 653 (1980). Together, these conditions satisfy the statutory requirements of 49 U.S.C. § 10505(g)(2).[8]

(Emphasis added) (footnote added). On March 8, 1985, the ICC, under 49 U.S.C. § 10505, exempted from the prior review requirements of 49 U.S.C. § 10901 the defendants' track construction proposal petitioned for in November of 1984, this time finding that the imposition of employee protective conditions would not be necessary. Thus, all three exemptions petitioned for by the defendants were granted.

Hours after ICC had issued its February 19 order, but several days before ICC had served the same on UTU, UTU submitted, again with RLEA, "Supplemental Comments" to its earlier letter of protest. The comments of UTU and RLEA noted

> that the railroads intend to (1) consolidate seniority rosters of Interstate train and engine service employees with sim-

ilar rosters of N & W's Pocahontas Division, with the result that N & W employees on the consolidated roster will perform work on Interstate; (2) transfer Interstate train dispatching work to the N & W; (3) abolish four Interstate train dispatching positions; and (4) allow N & W employees to perform maintenance-of-way work on Interstate which is now being performed by employees of Southern.

In addition, the comments contended that, although "the railroads may ask the affected employees to agree to these changes in their seniority and working conditions ..., *the railroads cannot unilaterally impose the changes or require the employees to arbitrate changes in the existing labor agreements.*" (Emphasis added). ICC considered UTU's challenges to the exemptions in its "Notice to the Parties," dated April 1, 1985. ICC concluded therein that "[n]o evidence has been presented to demonstrate that the involved railroads intend to abrogate the contractual or statutory rights of employees." ICC then reserved a determination of the issue, by stating as follows:

> Although exemptions under 49 U.S.C. [§] 10505 do not operate to relieve carriers of applicable laws and agreements relative to labor relations, *this [exemption] proceeding is not the appropriate forum to resolve the issue of whether applicable laws and labor agreements require the railroads to obtain the consent of employees before making employment changes....*

On April 26, 1985 the defendants notified UTU of the former's desire to submit the matter to arbitration pursuant to Article I, Section 4 of the *Mendocino Coast* conditions,[9] which provides that, when the parties have failed to reach an agreement through negotiation as to

> a dismissal or displacement of employees or rearrangement of forces ..., the ne-

---

**8.** *See supra,* note 7. The *"Mendocino Coast"* and *"New York Dock"* (*see supra,* p. 1010) conditions are virtually the same. *See infra,* discussion, pp. 1011–1012.

**9.** *See supra* note 8.

gotiations shall terminate and either party to the dispute may submit it for adjustment in accordance with the following procedures:

(a) Within five (5) days from the termination of negotiations, the parties shall select a neutral referee and *in the event they are unable to agree within said five (5) days upon the selection of said referee, the National Mediation Board ["NMB" or "the NMB"] shall immediately appoint a referee.*

*(b) No later than twenty (20) days after a referee has been designated a hearing on the* dispute shall commence.

(c) *The decision of the referee shall be final, binding, and conclusive* and shall be rendered within thirty (30) days from the commencement of the hearing of the dispute

. . . .

(Emphasis added). UTU objected to the compelled arbitration. Accordingly, when NMB appointed Robert J. Ables as neutral referee on June 13, 1985, said appointment was made "[o]ver the jurisdictional objection of ... UTU...." *Complaint*, at 5.[10]

On September 25, 1985, after conducting an arbitration hearing, evaluating both pre- and post-hearing briefs, and finding that the Panel had jurisdiction under Article I, Section 4, of the *Mendocino Coast* conditions, *supra*, the Panel issued the Award (UTU's L.W. Swert dissenting). Referee Ables determined that the "Carriers ... [were] authorized to put into effect the tentative implementing agreement of the parties, dated April 17, 1985." Defendants notified UTU shortly after the Award was

issued that it planned to put the agreement into effect on November 1, 1985.

UTU filed its complaint with this Court on October 25, 1985, alleging that on November 1 the defendants "intend[ed] to alter seniority and to [sic] unilaterally select employees to perform operations in connection with defendants petition for exemptions filed with the ICC on November 5, 1984...." *Complaint*, at 7–8. UTU contended that such action by the defendants would violate the rights of UTU members, employed by Interstate, under the RLA and collective bargaining agreements. *Id.* at 8. UTU maintains that, under 45 U.S.C. § 157, defendants could only "request ... UTU to arbitrate any dispute over proposed changes to existing rates of pay, rules, or working conditions, but that ... [UTU] has an absolute right to refuse such a request...." *Id.* at 7. Thus, UTU seeks declaratory judgment, under 28 U.S.C. §§ 2201 and 2202, from this Court that the *defendants* (vis-a-vis the ICC) have violated 45 U.S.C. §§ 152, 156, and 157 (under the RLA) "by requiring plaintiff to arbitrate proposed changes to existing rules and working conditions." *Id.* at 8. In addition, UTU requests that the Court preliminarily and permanently enjoin the defendants

from failing or refusing to participate in negotiations over the desired changes in existing collective bargaining agreements as required by ... [the RLA], 45 U.S.C. § 151, *et seq.*, by not abrogating or refusing to apply to [the twenty-seven] Interstate-UTU employees, the UTU-Interstate rules and working conditions until defendants have complied with Section 6 of ... [RLA], 45 U.S.C. § 156

**10.** UTU argues that Article I, Section 4 of the *Mendocino Coast* conditions are directly contrary to Article I, Section 2 of the same conditions, the latter of which provides as follows:

The rates of pay, rules, working conditions and all collective bargaining and other rights, privileges and benefits (including continuation of pension rights and benefits) of employees under applicable laws and/or existing collective bargaining agreements or otherwise *shall be preserved unless changed by future collective bargaining agreements or applicable statutes.*

(Emphasis added). In addition, UTU contends that, under 45 U.S.C. § 157, UTU had "an absolute right to refuse such a request to arbitrate...." *Complaint*, at 7. That provision provides in pertinent part that "the failure or refusal of either party to submit a controversy to arbitration shall not be construed as a violation of any legal obligation imposed upon such party by the terms of this Act or otherwise." *See infra*, discussion, pp. 1012–1013.

["Procedure in changing rates of pay, rules, and working conditions"].[11] (Footnote added.)

## DISCUSSION

### Subject Matter Jurisdiction

■ "It is the burden of the party claiming subject matter jurisdiction to demonstrate that it exists." *Georgiades v. Martin-Trigona*, 729 F.2d 831, 833 n. 4 (D.C. Cir.1984). *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). In a non-diversity context, the Court has "subject matter jurisdiction over cases that involve the violation of some federal law: the Constitution, a statute, or an agency regulation." *Orlowski v. Massachusetts Rehabilitation Comm'n*, 585 F.Supp. 1408, 1409. In addition, "[i]t is up to the plaintiff in a federal case to point this law out; otherwise the Court is powerless to act.... It is not enough for ... [the plaintiff] to say he has been wronged; he must point to the laws that give the federal court the power to act in his case." *Id.* Moreover, only in an exceptional case should a federal court defer the resolution of a jurisdictional issue in favor of a decision on the merits. *Doe v. United States Dep't of Justice*, 753 F.2d 1092, 1101 (D.C.Cir.1985). Otherwise, a federal court must be "fastidious about the impropriety of reaching merits issues without first establishing jurisdiction...." *Beattie v. United States*, 756 F.2d 91, 126–27 (D.C.Cir.1984) (Scalia, J., dissenting, opinion filed Feb. 26, 1985).

In the present case, UTU contended originally that this Court was vested with subject matter jurisdiction to evaluate the merits of the instant case, "by virtue of 28 U.S.C. §§ 1331 ["Federal question"] and 1337 ["Commerce and antitrust regulations ..."], and 45 U.S.C. § 153 ["National Railroad Adjustment Board"] to issue the [declaratory and injunctive] relief requested herein under 28 U.S.C. §§ 2201 and 2202." *Complaint*, at 2.

■ In its response to the defendants' motion to dismiss for lack of subject matter jurisdiction ("*Response*"), UTU abandoned its claim for federal question jurisdiction by relying solely on the proposition that "this case is one arising under two Acts of Congress which regulate interstate commerce—*i.e.*, the Interstate Commerce Act ... and the Railway Labor Act ...—and thus within this Court's subject matter jurisdiction under 28 U.S.C. § 1337." *Response*, at 5.[12]

---

**11.** In addition, UTU seeks an order that would "make whole all of their employees who are adversely affected ..." by the defendants' alleged failure to comply with the RLA, and "other further relief as this Court may deem to be just and proper...." Given the Court's resolution of the case on subject matter jurisdiction and judicial propriety grounds, it need not address these additional relief requests.

**12.** Defendants note correctly that, in its search for subject matter jurisdiction, UTU has, in effect, attempted to amend its complaint by bolstering its Section 1337 (commerce laws) assertion with a new allegation concerning violations of the ICA. *See Reply Memorandum of Defendants in Support of their Motions to Dismiss ("Reply")* at 18. UTU's quest for jurisdiction would proceed one step further: less than an hour before the Court conducted its hearing on UTU's motion for a preliminary injunction, UTU filed a motion to amend its complaint. The proposed version of the complaint cited still another ground for jurisdiction: 28 U.S.C. § 1336(a) ("Interstate Commerce Commission's orders"). *Amended Complaint*, at 2. UTU asserted therein that this action was being "brought to enforce

the commands ... of the [February 19, 1985 "Notice of Exemption"] order of the Interstate Commerce Commission...." *Id.* at 1. However, Section 1336(a) grants jurisdiction to the district courts only over "any civil action to enforce, in whole or in part, any order of the Interstate Commerce Commission ... *for the payment of money or the collection of fines, penalties, and forfeitures.*" (Emphasis added). The exemption order in question cannot be properly characterized under this provision: where a plaintiff challenges an ICC order that does not concern "the payment of money or the collection of fines, penalties and forfeitures," the order may be challenged only in the court of appeals under 28 U.S.C. §§ 2321(a) and 2342(5). *See, e.g., State of Illinois, Dep't of Public Aid v. Schweiker*, 707 F.2d 273, 276 (7th Cir.1983) (district court appropriate forum); *City of New Orleans v. Southern Scrap Metal Co., Ltd.*, 704 F.2d 755, 761 (5th Cir.1983) (same); *Pullman Standard, A Division of Pullman, Inc. v. ICC*, 705 F.2d 875, 878–79 (7th Cir.1983) (circuit court appropriate forum; Sections 1336(a) and 2321(a) "mutually exclusive"). Thus, plaintiff's Section 1336(a) argument is not only a late

It is clear that UTU has failed to demonstrate a specific statutory basis under the RLA for subject matter jurisdiction, even though UTU relied on 45 U.S.C. § 153(q) in its original complaint: UTU is not petitioning this Court to review an "order" or "award" of the first division of the National Railroad Adjustment Board ("NRAB"). The action or actions challenged by UTU were obviously taken by ICC, NMB, and the Panel that issued the Award in question. In fact, counsel for UTU conceded during the November 21 preliminary injunction hearing that in the original complaint he had attempted in vain "to fit a square peg into a round hole." Likewise, as defendants point out, UTU has failed to identify a specific statutory provision within the ICA that confers subject matter jurisdiction upon this Court to evaluate the Panel's Award. *See Reply*, at 19. *See also supra* note 12.

Thus, UTU's complaint boils down to a potential action for declaratory and injunctive relief, which concerns alleged abrogations of several employee protective provisions strewn throughout the RLA and the ICA. In such a case, *"Gully v. First National Bank*, 299 U.S. 109 [57 S.Ct. 96, 81 L.Ed. 70] ... [ (1936) ], prescribes the rules to be applied in determining whether an action arises [for purposes of 28 U.S.C. § 1337] under the provisions of the Interstate Commerce Act or the Railway Labor Act." *Brotherhood of Locomotive Engineers v. Chicago and North Western Railway Co.*, 314 F.2d 424, 428 (8th Cir.), *aff'g*, 202 F.Supp. 277 (S.D.Iowa 1962), *cert. denied*, 375 U.S. 819, 84 S.Ct. 55, 11 L.Ed.2d 53 (1963): "Gully ... states the test of jurisdiction: 'The right of immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another.'" *Id.* (quoting *Gully*, 299 U.S. at 112, 57 S.Ct. at 97).

At this juncture, however, the Court need not address the Section 1337 characterization issue. Rather, it concludes that, arrival—it missed the appropriate runway as

whether or not UTU has made out a subject matter jurisdiction basis for a "civil action or proceeding arising under any Act of Congress regulating commerce ...," judicial review of the Award is not appropriate for alternative reasons: if the Award as issued by the Panel is a "final order" of the ICC, it is reviewable only by the court of appeals under 28 U.S.C. §§ 2321(a) and 2342(5), *see supra* note 12; and, if it is not so characterized by the ICC, the Award is not an administrative decision presently ripe for judicial review. *See Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 246, 73 S.Ct. 236, 241, 97 L.Ed. 291 ("declaratory judgment procedure will not be used to preempt and prejudge issues that are committed for an initial decision to an administrative body").

### Final Order or Ripeness and Exhaustion

When it reserved its determination of the issue concerning whether "applicable laws and labor agreements require the railroads to obtain the consent of employees before making employment changes," *see supra* p. 1011, the ICC apparently referred, *sub silentio*, said determination to the Panel. *See In Re Norfolk and Western Railway*, slip op., at 15 (Ables, Arb., decision filed September 25, 1985): "If the ... [ICC] meant that the appropriate forum was the courts, it was ducking ... [its] responsibilities.... There is no need for this arbitration panel to duck."

Under Article I, Section 4(c), of the *Mendocino Coast* conditions imposed on the defendants by the ICC in its February 19, 1985 exemption order, *"The decision of the referee shall be final, binding, and conclusive...."* (Emphasis added). Thus, it seems that the ICC delegated its final order-making authority to the Panel, and that the resulting Award would therefore be appealable only to the United States Court of Appeals for the District of Columbia Circuit. *See* 28 U.S.C. § 2342(5) (court of appeals has "exclusive jurisdiction" to en- well.

join, set aside, suspend (in whole or in part), or to determine the validity of all final orders of ICC).[13]

It would therefore be the responsibility of the circuit court to determine whether the exemption procedure designed and utilized by the ICC in this case comports with the standard established in *Brotherhood of Locomotive Engineers ("BLE") v. ICC*, 761 F.2d 714, 724–25 (D.C.Cir.1985) (Wright, J.), that in granting consolidation-related exemptions under the ICA while waiving employee protective provisions of the RLA, the ICC exceeds its authority unless it makes an evidentiary determination that waiver is "necessary to effectuate the transactions at issue."[14]

If it is the ICC's policy not to consider such an award a final order, then the ripeness doctrine, *see Friends of Hop Marketing Order v. Block*, 753 F.2d 777, 778 (9th Cir.1985) (per curiam), or the doctrine of exhaustion would preclude judicial review at this time. *See McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969).

In any event, under either the final order or ripeness/exhaustion analysis, it is not for this Court to determine the merits of UTU's purported RLA and ICA claims for declaratory and injunctive relief under Section 1337. *See Telecommunications Research and Action Center ("TRAC") v. FCC*, 750 F.2d 70 (D.C.Cir.1984) and *Air Line Pilots Association, International ("ALPA") v. CAB*, 750 F.2d 81 (D.C.Cir. 1984) (where 28 U.S.C. § 2342 commits review of final agency action to court of appeals, any suit seeking relief that might affect that court's future jurisdiction is subject to its exclusive review). Thus, the appropriate remedy for this case is dismissal of the complaint. *See Public Utility*

*Commissioner of Oregon v. Bonneville Power Administration*, 767 F.2d 622, 631 (9th Cir.1985) (complaint seeking district court review under Pacific Northwest Electric Power and Planning Act, 16 U.S.C. § 839, *et seq.*, dismissed).[15]

In accordance with this opinion, an order denying UTU's motion for a preliminary injunction and dismissing UTU's complaint for lack of subject matter jurisdiction shall be issued contemporaneously herewith.

---

**13.** UTU represented during the preliminary injunction hearing that such awards were considered to be final ICC orders; in addition, UTU acknowledged that an informal agency procedure existed whereby aggrieved parties could request a clarification of the legal status of such award from the ICC.

**14.** BLE post-dated the exemption orders at issue here.

**15.** If, on the other hand, the Award at issue were unquestionably a final ICC order, the Court would not be compelled to order dismissal. Rather, it could exercise its option to transfer the case to the circuit court pursuant to 28 U.S.C. § 1631. *See* TRAC, 750 F.2d at 79 n. 37.