**UNITED TRANSPORTATION UNION, Appellant**

v.

**NORFOLK AND WESTERN RAILWAY CO., et al.**

**No. 86–5003.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 13, 1987.

Decided June 30, 1987.

John O'B. Clarke, Jr., with whom John J. Delaney, Washington, D.C., was on the brief, for appellant.

Jeffrey S. Berlin, with whom Russell E. Pommer, Washington, D.C., and William P. Stallsmith, Jr., Atlanta, Ga., were on the brief, for appellees.

Before WALD, Chief Judge, and SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

---

D.H. GINSBURG, Circuit Judge:

The Interstate Commerce Commission ("Commission") imposes various labor protective conditions when it approves, or exempts from prior approval, proposals by railroads to consolidate their operations. In this case, an arbitration panel resolved a dispute arising under such conditions, and the United Transportation Union ("UTU" or "the Union") brought a suit to challenge the award under the Railway Labor Act ("RLA").[1] The sole issue before us is whether the district court had subject matter jurisdiction over the Union's challenge. The district court dismissed the Union's action, reasoning that the arbitration award was either a final decision of the Commission, reviewable only by the court of appeals, or not final administrative action ripe for review, 627 F.Supp. 1008. We hold that the arbitration panel's award was an order of the Commission, and conclude that therefore, regardless of whether it was final or nonfinal, the order is ultimately subject to the exclusive jurisdiction of the court of appeals. 28 U.S.C. §§ 2321(a),[2] 2342(5).[3] We therefore affirm the district court.

## I. LABOR PROTECTIVE CONDITIONS

Before turning to the facts of this case, we briefly describe the operation of labor protective conditions imposed by the Commission in railroad consolidations. When two or more railroads wish to consolidate certain aspects of their operations, they must first satisfy various requirements imposed by the Interstate Commerce Act, as amended.[4] Carriers may, however, petition the Commission to exempt a proposed transaction from such requirements, pursuant to 49 U.S.C. § 10505. Subsection 10505(a) requires the Commission to grant an exemption when the application of such a provision:

(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

Section 10505(g)(2), however, prohibits the Commission from exercising this exemption authority "to relieve a carrier of its obligation to protect the interests of employees as required by [the same] subtitle."[5]

In carrying out its statutory mandate to prescribe employee protective conditions, the Commission customarily imposes one or another of several sets of conditions, commonly referred to by the name of the case in which they were first adopted. In the case under review, the Commission applied the so-called *Mendocino Coast* and *Norfolk and Western* conditions.[6] *Mendocino*

---

1. 45 U.S.C. § 151, *et seq.*

2. 28 U.S.C. § 2321(a) provides:

   Except as otherwise provided by an Act of Congress, a proceeding to enjoin or suspend, in whole or in part, a rule, regulation, or *order* of the Interstate Commerce Commission shall be brought in the court of appeals as provided by and in the manner prescribed in chapter 158 of this title. (Emphasis added).

3. The relevant portion of 28 U.S.C. § 2342 provides:

   The court of appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of— ... (5) all rules, regulations, or *final orders* of the Interstate Commerce Commission made reviewable by section 2321 of this title. (Emphasis added).

4. The requirements pertinent to this case are set forth in 49 U.S.C. §§ 11343 and 10901.

5. Section 11347 sets out the employee protective obligations for rail carriers, such as appellees here, seeking an approval of, or exemption for, a proposal to merge or otherwise coordinate or consolidate their activities in a manner identified in section 11343. *See McGinness v. I.C.C.,* 662 F.2d 853 (D.C.Cir.1981) (employee protective conditions of section 11347 apply to transactions exempted from approval by the Commission pursuant to section 10505, as well as to those for which a carrier seeks approval).

6. The *Mendocino Coast* conditions derive from *Mendocino Coast Ry.—Lease and Operate—California Western R.R.,* 354 I.C.C. 732 (1978), *modified,* 360 I.C.C. 653 (1980). The *Norfolk and Western* conditions derive from *Norfolk & Western Ry.—Trackage Rights—Burlington Northern, Inc.,* 354 I.C.C. 605 (1978), *modified sub nom. Mendocino Coast Ry.—Lease and Operate—California Western R.R.,* 360 I.C.C. 653 (1980). We affirmed both decisions *sub nom. Railway Labor Executives' Ass'n v. United States,* 675 F.2d 1248 (D.C.Cir.1982).

*Coast* provides for full wages and benefits for dismissed employees for up to six years, and, for employees transferred to lower paying jobs, a displacement allowance equal to the difference between their prior and subsequent earnings. The *Norfolk and Western* conditions contain similar provisions.

Under both *Mendocino Coast* and *Norfolk and Western,* either the carrier or the union may ultimately call for arbitration if the two sides fail to conclude what is commonly termed an "implementing agreement." Article I, Section 4 of *Mendocino Coast* prescribes the procedure that must be followed before either party invokes arbitration. Under *Mendocino Coast,* a railroad must first give at least 20 days notice of its intention to lease or operate the properties of another rail carrier, 354 I.C.C. 732, 733; under *Norfolk and Western,* the same notice must be given when a railroad plans to acquire "trackage rights over, joint ownership in, or joint use of" lines operated by another railroad.[7] 354 I.C.C. 605, 610. Either side may then call for negotiations, which may last no more than 20 days. The conditions state:

> Each transaction which will result in a dismissal or displacement of employees or rearrangement of forces, shall provide for the selection of forces from all employees involved on basis [sic] accepted as appropriate for application in the particular case and any assignment of employees made necessary by the transaction shall be made on the basis of an agreement or decision under this section 4.

If there is a failure to reach an implementing agreement at the end of the negotiation period, the parties must select a neutral referee, or, if they cannot even agree on that, ask the National Mediation Board to appoint one. The referee must hold a hearing, and thereafter issue a "final, binding, and conclusive" decision.

## II. BACKGROUND

The appellees in this case are three railroads, all of which are direct or indirect subsidiaries of Norfolk Southern Corporation ("Norfolk Southern"). They are the Southern Railway Company ("Southern"), the Interstate Railroad Company ("Interstate"), a wholly owned subsidiary of Southern, and the Norfolk and Western Railway Company ("N & W"). Interstate is a small railroad, having less than 40 miles of main line and operating in the coal fields of southwestern Virginia. Its lines lie in between those of the Southern and the N & W, and serve to connect the other two railroads. The Interstate originates substantial amounts of coal traffic.

Because the carriers planned to integrate certain aspects of their operations, they petitioned the Commission for three exemptions—as more fully described below—from the prior review requirements normally applicable to railroad consolidations. Their intention was for the N & W and the Southern jointly to operate the Interstate's properties, with the N & W assuming responsibility for all of the Interstate's train operations. (The Southern's intended role is not entirely clear to us, but it is of no moment to our disposition of the case). The new arrangement would permit the carriers to take advantage of better grades and operating routes for traffic moving from Interstate origins to points on the N & W and Southern lines. The carriers also agreed to send future coal shipments originating on the eastern portion of the Interstate over N & W lines, rather than over Southern lines, in order to accommodate the intensive use of the Southern's lines that they anticipated as a result of an exchange of trackage rights between the Southern and an unaffiliated railroad.

All three exemptions were ultimately granted.[8] First, on February 19, 1985, the Commission exempted from the prior review requirements of 49 U.S.C. § 11343 the

---

7. Because there are no further differences between the *Mendocino Coast* and *Norfolk and Western* conditions material to this case, we refer to both hereinafter under the *"Mendocino Coast"* sobriquet.

8. *N & W, Southern and Interstate—Exemption—Control to Operate and Trackage Rights,* Finance Docket No. 30582.

contract that allows the N & W and the Southern jointly to operate the Interstate's properties.[9] Second, the Commission at the same time exempted from the prior review requirements of section 10901 the N & W's proposal to conduct operations over an additional 2.3 miles of the Southern's line. Finally, several weeks later, the Commission granted the Interstate an exemption from the same provision, enabling that railroad to construct connecting tracks to the N & W's lines at both Norton and Tacoma, Virginia.

Pursuant to section 10505(g)(2), the Commission subjected the first exemption, for the N & W and the Southern to operate the Interstate's properties, to the *Mendocino Coast* conditions. It made the *Norfolk and Western* conditions applicable to employees affected by the N & W's acquisition of trackage rights over the Southern, as permitted under the second exemption. The Commission determined that employee protective conditions were not necessary, however, in connection with the third exemption, for the Interstate's track construction proposal.

In order to carry out these integrative transactions, the carriers deemed it necessary to reassign certain employees. Thus, for purposes of work assignments, they planned to integrate the Interstate's train and engine service employees with those performing similar duties on the N & W Pocahontas Division. A change of the employees' reporting site was also planned. Because of the operational difficulties that adherence to their existing collective bargaining agreements would entail, they also anticipated that the Interstate's 27 trainmen and conductors would become subject to the collective bargaining agreements between the N & W and the UTU.

Therefore, even before the Commission granted the exemptions and imposed employee protective conditions, the carriers notified the Union that the Norfolk Southern intended to "coordinate and/or consolidate track and engine service, forces and seniority rosters on the Interstate and Norfolk and Western" lines, and called for the negotiation of an implementing agreement. Joint Appendix ("J.A.") at 59. Appellant railroads served this notice in accordance with Article I, Section 4 of the *"New York Dock"* labor protective conditions, anticipating that the Commission would grant the exemptions and impose those conditions.[10] There followed several days of negotiations between the Union and the carriers, which led to a tentative agreement. It was rejected by the 27 Interstate trainmen and conductors who would be affected, however, because they objected to being transferred to the N & W/UTU bargaining agreement, as provided for in the tentative agreement.

After the carriers' petitions for exemption were granted, the Norfolk Southern notified the UTU on March 27, 1985, of its desire to submit the matter to arbitration pursuant to Article I, Section 4 of the *Mendocino Coast* conditions. The UTU protested to the Commission that the railroads could not unilaterally compel the employees to submit major changes in their working conditions to arbitration. Under the RLA, the Union argued, the railroads could only effect changes in seniority and working conditions with the consent of the employees whose bargained-for rights would be affected. The Commission, however, declined to intercede, stating that "[n]o evidence has been presented to demonstrate that the involved railroads intend to abrogate the contractual or statutory rights of employees." Finance Docket No. 30582 (Sub-No. 1, April 1, 1985). The Commission then remarked:

---

9. The Commission granted the exemption under 49 U.S.C. § 10505, pursuant to 49 C.F.R. § 1180.2(d)(3), which exempts as a class "[t]ransactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family."

10. The *New York Dock* conditions derive from *New York Dock Ry.—Control—Brooklyn Eastern Dist. Terminal,* 360 I.C.C. 60, *aff'd sub nom. New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979). In fact, the *Mendocino Coast* conditions, which the Commission did impose, are substantially similar.

Although exemptions under 49 U.S.C. 10505 do not operate to relieve carriers of applicable laws and agreements relative to labor relations, this [exemption] proceeding is not the appropriate forum to resolve the issue of whether applicable laws and labor agreements require the railroads to obtain the consent of employees before making employment changes under either the exempted contract to operate or the trackage rights.

*Id.* at 44–45.[11]

Subsequently, the National Mediation Board appointed Robert J. Ables as the neutral referee. A representative of the carriers and of the Interstate employees also served as members of the "arbitration panel," but for all practical purposes the decision was in the hands of the referee, since the *Mendocino Coast* conditions provide that the "decision of the referee shall be final, binding, and conclusive...." A principal issue in the arbitration was whether the panel had authority to transfer the employees to a new bargaining agreement without their consent.

On September 25, 1985, the neutral referee determined that the panel had jurisdiction under Section 4 of *Mendocino Coast* and issued an award. Referee Ables concluded:

> [T]he ICC can take all necessary action to authorize a consolidation, including labor protective conditions and procedures to resolve disputes on implementing agreements, including arbitration with-

out deference to RLA collective bargaining rights.

Finance Docket No. 30582 (Sub-No. 1). He then granted the railroads authority to put into effect the terms of the proposed agreement rejected by the Interstate employees. The railroads notified the Union that the agreement would go into effect on November 1, 1985.

On October 25, 1985, the UTU filed a complaint in the district court alleging that the carriers' planned action would violate the major dispute procedures of the RLA.[12] The court initially granted a temporary restraining order so as to maintain the status quo, but that order was dissolved on November 29, 1985, when the Union's motion for a preliminary injunction was denied. The court then dismissed the complaint, pursuant to Fed.R.Civ.P. 12(b)(1), for lack of subject matter jurisdiction. The Union had properly presented its case as, and the court properly treated it as, a challenge to the arbitration award upholding the railroads' planned action. The court's ruling was based on alternative grounds:

> [I]f the Award as issued by the Panel is a "final order" of the Commission, it is reviewable only by the court of appeals under 28 U.S.C. §§ 2321(a) and 2342(5) ...; and, if it is not so characterized by the Commission, the Award is not an administrative decision presently ripe for judicial review.

*United Transportation Union v. Norfolk and Western Railway Co.,* 627 F.Supp. 1008, 1014 (D.D.C.1985). In discussing

---

**11.** The arbitrator later appointed in the proceedings below chided the Commission for "ducking its clear responsibility" to resolve the issue placed before it by the Union's petition. J.A. 31. Whether this be so or a canard, however, the ICC "has consistently refused to become involved in individual employee disputes arising under imposed employee protective conditions, deferring instead to arbitration for determination of causation issues and factual questions." *Chicago and North Western Transportation Company—Abandonment,* Docket No. AB–1 (Sub-Nos. 83 and 113), decision served April 28, 1987, slip op. at 3, *citing Brotherhood of Locomotive Engineers v. ICC,* 808 F.2d 1570 (D.C.Cir.1987); *Walsh v. ICC,* 723 F.2d 570, 574 (7th Cir.1983); *Bell v. Western Maryland Railroad Co.,* 366 ICC 64, 68 (1982). When the Commission was "for the first time ... asked to review an arbitration

decision awarding benefits under Commission-imposed employee protection conditions," it did so and established standards for its review of such arbitration awards. *Id.* at 6–7.

**12.** The RLA has separate procedures for "major disputes," which relate to the formation of an initial collective bargaining agreement or an attempt by one of the parties to alter the terms of that agreement, and "minor disputes," which involve rights grounded in existing collective bargaining agreements. *Elgin, J. & E. Ry. v. Burley,* 325 U.S. 711, 722–24, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945). Major disputes are never subject to mandatory arbitration under the RLA, while minor disputes may be. *See infra* note 20.

whether the award was final agency action, the court noted that the *Mendocino Coast* conditions provide that "[t]he decision of the referee shall be final, binding, and conclusive," *id.* at 1014 (emphasis omitted), which certainly tended to suggest that the award was final agency action. The court went on to say, however, that if the Commission would not regard the award as final, "then the ripeness doctrine ... or the doctrine of exhaustion would preclude judicial review at this time." [13] This appeal followed.

### III. DISCUSSION

#### A.

UTU contends first that the lower court had jurisdiction because the arbitral decision was not a final order of the Commission within the meaning of 28 U.S.C. § 2342. Alternatively, the Union argues that rights under the RLA can be vindicated in the district court even if doing so requires that an order of the Commission be challenged there. In either case, according to the Union, the district court had jurisdiction to decide the action under 28 U.S.C. §§ 1331 and 1337 because it concerns a violation of the mandatory negotiating requirements and other rights provided by the RLA and codified at 45 U.S.C. §§ 152, First and Seventh, and 156. The first two of these provisions require labor and management to "exert every reasonable effort" to settle disputes concerning rates of pay, rules, or working conditions,[14] and forbid carriers from changing rates of pay, rules, and working conditions without following the procedures of section 156.[15]

The last-cited provision, 45 U.S.C. § 156, provides that carriers or employee representatives who wish to propose changes in rates of pay, rules, or working conditions must notify the other side and negotiate the proposals. If the parties fail to reach agreement, they may invoke the services of the National Mediation Board to continue the negotiations.[16] If the Board determines that the parties have reached an impasse, it encourages them to submit the dispute to arbitration pursuant to section 157. Unlike arbitration under Commission-imposed employee protective conditions, however, arbitration under the RLA is entirely voluntary. If either party refuses to go to arbitration, the Board withdraws from the dispute and, after a 30-day cooling off period, the parties may resort to self-help.[17]

UTU's claim is, essentially, that the decision of the arbitration panel violated the RLA by transferring the 27 Interstate employees to a new bargaining agreement. This argument, however, goes to the merits. In light of the District Court's dismissal, our function is simply to determine whether the Union knocked on the wrong door in seeking judicial review of the arbitration award.

#### B.

It is beyond dispute that Congress "may prescribe the procedures and conditions under which, and the courts in which, judicial

---

**13.** The District Court was prudent to consider alternate characterizations of the arbitral award. Without intimating any view on the merits of a case not before us, we note the Commission's recent decision in *Chicago and North Western Transportation Company—Abandonment, supra* note 11, asserting jurisdiction to review arbitration awards.

**14.** 45 U.S.C. § 152, First, provides:
It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

**15.** *Id.* § 152, Seventh, provides:
No carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

**16.** *Id.* § 155, First.

**17.** *See Brotherhood of Locomotive Engineers v. Baltimore & Ohio R.R.,* 372 U.S. 284, 291, 83 S.Ct. 691, 695, 9 L.Ed.2d 759 (1963).

review of administrative orders may be had." *City of Tacoma v. Taxpayers*, 357 U.S. 320, 336, 78 S.Ct. 1209, 1218, 2 L.Ed.2d 1345 (1957). In 28 U.S.C. § 2342, Congress conferred exclusive jurisdiction on the court of appeals "to enjoin, set aside, suspend (in whole or in part), or to determine the validity of ... (5) all rules, regulations, or final orders of the Interstate Commerce Commission made reviewable by section 2321 of this title." The UTU represents in its complaint that it initiated this action for the express purpose of "reviewing and setting aside" the arbitrator's decision. J.A. at 5. The crucial question, therefore, is whether the arbitral award was an order of the Commission. The answer depends upon the statutory authority for the arbitration mechanism.

Review of the statutory scheme leaves us with no doubt that the arbitral award must be treated as an order of the Commission. Under 49 U.S.C. § 10505(g)(2), the Commission must impose appropriate labor protective conditions, pursuant to section 11347, when it either approves a transaction or permits one to proceed exempt from the statutory approval requirements. When it exempted the Interstate transaction, the Commission imposed the *Mendocino Coast* conditions, and it is that Commission decision that exposed the Union to binding arbitration at the instance of the carriers. The arbitrator derives whatever authority he has from that order of the Commission. The Union's challenge to the arbitral award is a challenge to the Commission's authority, through its delegate, to diminish rights said otherwise to be conferred by the RLA. Although the Commission did not expressly state that it delegated to the arbitrator authority to affect those rights, we think—as did the arbitrator—the delegation was necessarily implicit. The conclusion that the arbitral award, like the exemption award from which it derives, was functionally an "order of the Commission" within the meaning of 28 U.S.C. § 2321(a) is therefore inescapable. Accordingly, the district court lacked subject matter jurisdiction to entertain the

challenge. The proper avenue of appeal is prescribed by 28 U.S.C. §§ 2321(a) and 2342(5), although immediate access to that avenue depends upon the further question whether the arbitral decision was a "final order" of the Commission within the meaning of 28 U.S.C. § 2342.

The Union's argument for jurisdiction below rests crucially on the proposition that it is asserting violations of the RLA rather than defects in an order of the Commission. For us to agree, however, would enable a party, merely by drafting an artfully worded complaint, to avoid the bar of a clearly applicable jurisdictional statute. The Union's complaint is with the Commission and the arbitration it set up. Its theory is that neither the Commission nor its arbitrator can lawfully issue an order that derogates the Union's rights under the RLA, not that they have somehow 'violated' the RLA. To view the matter otherwise would be to allow the complainant's own description of its theory to determine the forum with jurisdiction. In *City of Rochester v. Bond*,[18] we explicitly rejected the notion that the proper avenue of judicial review of agency action should depend upon the substantive infirmity alleged.

> The rationale for statutory review is that coherence and economy are best served if all suits pertaining to designated agency decisions are segregated in particular courts. The choice of forum is, as we have said, for Congress and we cannot imagine that Congress intended the exclusivity *vel non* of statutory review to depend on the substantive infirmity alleged. The policy behind having a special review procedure in the first place similarly disfavors bifurcating jurisdiction over various substantive grounds between district court and the court of appeals. The likelihood of duplication and inconsistency would exist in either case.

*Id.* at 936.

While this Circuit has not previously passed on the proper course for the review of arbitral awards issued under conditions imposed by the Commission, we have re-

**18.** 603 F.2d 927 (D.C.Cir.1979).

jected other attempts to short-circuit similar statutory review procedures. *Carey v. O'Donnell,*[19] for example, is closely on point. There we held that the district court lacked jurisdiction to entertain an attack by airline pilots on an integrated seniority list incorporated in a collective bargaining agreement by two merging airlines and approved by the Civil Aeronautics Board ("CAB"). Like orders of the Commission, orders of the CAB were subject to the exclusive jurisdiction of the courts of appeals. 49 U.S.C. § 1486(d). We held that the actions in the district court, "although couched in terms of violations of the RLA and the [Age Discrimination in Employment Act of 1967], are essentially collateral attacks" on an order of the CAB. *Accord, Oling v. Air Line Pilots Association,* 346 F.2d 270 (7th Cir.1965).

In a closely related context, the district court in *Lee v. St. Louis Southwestern Ry. Co.,* 633 F.Supp. 19 (E.D.Mo.1986), dismissed an action challenging the results of an arbitration conducted pursuant to labor protective conditions imposed by the Commission in approving a merger, where the "[p]laintiffs attempt[ed] to invoke the jurisdiction of [the District] Court pursuant to the [RLA]," specifically sections 153, First and Second.[20] The district court noted that the RLA sections relied upon by the plaintiffs established jurisdiction for appeals of National Railroad Adjustment Board ("NRAB") and public law board decisions, but "do not apply to Arbitration Committee decisions made pursuant to Interstate Commerce Commission orders. Appeal of such decisions is governed by 28 U.S.C. § 2342(5)." *Id.* at 20.

The courts that have assented to district court review of arbitral awards rendered pursuant to Commission-imposed conditions have been obscure, when not altogether silent, on the question of jurisdiction. Thus, in *Anderson v. Norfolk & Western Ry.,* 773 F.2d 880 (7th Cir.1985), the district court had granted summary judgment against a group of employees claiming that the arbitrator, appointed pursuant to the *New York Dock* conditions, exceeded his authority by supplanting his earlier award. The Seventh Circuit ordered the district court to dismiss the complaint for lack of jurisdiction because the plaintiffs lacked standing. It noted in passing that "the [district] court does have subject matter jurisdiction," 773 F.2d at 882, but it gave no further consideration to whether the action was properly commenced in the district court or lay within the exclusive jurisdiction of the court of appeals.

Similarly, in *Armstrong Lodge No. 762 v. Union Pacific R.R.,* 783 F.2d 131 (8th Cir.1986), the Eighth Circuit affirmed a decision in which a district court reviewed an arbitration award, also rendered pursuant to the *New York Dock* conditions. A local union claimed that the arbitrator exceeded the scope of his authority and that the international union breached its duty of fair representation. The district court rejected both claims, relying on the view that the limited standard of review applicable to arbitration awards of the NRAB also applied to the arbitrator's decision under the *New York Dock* conditions. On review, the Eighth Circuit affirmed, but the question of the district court's jurisdiction was apparently never raised in the circuit court, and the district court opinion being unpublished, we have no indication that it was argued below. While the Seventh and Eighth Circuit cases may thus be distinguished, insofar as they suggest a result different than the one we reach today, we

---

**19.** 506 F.2d 107 (D.C.Cir.1974).

**20.** "Minor disputes" may be initially submitted to one of three bodies under the RLA: the National Railroad Adjustment Board ("NRAB"), 45 U.S.C. § 153, First; "special boards of adjustment," *id.* § 153, Second, Second Paragraph.

The RLA explicitly provides for judicial review in the district court for the decisions of the NRAB and of public law boards. § 153, First (p); Second, Second Paragraph. The RLA is silent, however, as to whether district court review is available for the decisions of special boards of adjustment, See *Merchants Despatch Transportation Corp. v. Systems Federation,* 551 F.2d 144, 147–148 (7th Cir.1977), and makes no reference whatever to arbitral decisions made pursuant to the labor protective provisions of the Interstate Commerce Act.

simply find them unpersuasive.[21] They could hardly be persuasive, however, on an issue that, even if mentioned, was not discussed.

The Union argues that an arbitral award under the *Mendocino Coast* conditions is comparable to a decision of a special board of adjustment acting pursuant to 45 U.S.C. § 153, Second, First Paragraph, and that it is therefore subject to district court review. Congress was silent as to the procedure for review of adjustment board awards, *see supra* note 21, but two circuit courts have allowed challenges to such decisions to proceed in district court. *Merchants Despatch Transportation Corp. v. Systems Federation*, 551 F.2d 144 (7th Cir.1977); *Employees Protective Ass'n v. Norfolk & Western Ry.*, 511 F.2d 1040 (4th Cir.1975).

We have no occasion to disagree with those decisions because we find the analogy inapposite. In both cases, the courts found it significant that special boards of adjustment are creatures of the RLA. They thought that decisions of special boards should be reviewed in the same way that other arbitral awards made pursuant to the RLA are reviewed. We express no view on that question; we may assume that those decisions are correct. For present purposes, we need only note that the Ables award is directly traceable to labor protective conditions imposed by the Commission in carrying out its responsibility under the Interstate Commerce Act. It does not derive its vitality in any part from the RLA and there is no particular reason to suggest that it should be reviewed like a decision of a special board constituted pursuant to the RLA. It is true that resolution of the issues raised by the Union's challenge to the arbitrator's award may, like a challenge to a special board decision, affect rights claimed under the RLA. But it may affect rights claimed under other statutes as well; that is neither here nor there in determining where judicial review is available. The key facts are the source of authority for the award—here the Interstate Commerce Act—and the way in which Congress has specified that orders exercising that particular authority are to be reviewed.[22]

The UTU also advances the curious proposition that the Ables award cannot be considered an order of the Commission because "the ICC never had jurisdiction to address the RLA issues raised in the Award because the ICC only acted within the context of an exemption proceeding, which does not operate to relieve carriers of their obligations under the RLA."[23] The Union argues that an exemption proceeding "simply means that the Commission considers the transaction proposed by the carriers to be so insignificant that it need not be reviewed by the Commission."[24] In the Union's view, the Ables award was "the product of an independent arbitrator subject to review in federal district courts pursuant to the RLA."[25]

We must reject these contentions. The requirement of the Interstate Commerce Act that the Commission impose labor protective conditions when it exempts a transaction from prior review merely substitutes one form of continuing Commission oversight for another. The exemption implies neither that the transaction should be treated as though it had not been subject to regulation *ab initio*, nor that the arbitral

---

21. *See also Brotherhood of Locomotive Engineers v. New York Doc. R.R.*, 94 CCH Lab. Cas. ¶ 13,704 (E.D.N.Y.1981) [Available on WESTLAW, DCT database] (awards of arbitration boards established pursuant to labor protective conditions are subject to review in federal district court pursuant to 28 U.S.C. §§ 1331 and 1337 because such "[c]onditions represent a federal contract which is governed by federal law.") The parties in this case apparently did not argue, and the court did not address, the exclusive jurisdiction of the court of appeals to review final orders of the Commission.

22. The court in *Merchants Despatch* also weighed the need for a federal forum, rather than a state forum, for review of special board awards, in the interest of uniformity. Here, there is no need for concern about the Union's claims being remitted to state court, since review of final Commission orders by the federal courts of appeal is assured.

23. Brief of Appellant at 13.

24. *Id.*

25. *Id.* at 14.

regime substituted for the Commission's prior review of transactions is independent of the source of its statutory authority, *viz.* the Interstate Commerce Act.

Finally, the Union contends that even if the Commission did have jurisdiction at one time, it abdicated that jurisdiction by declining to address the Union's protests before the dispute was submitted to arbitration. The district court rejected this contention, concluding that the Commission was merely deferring any pronouncement about the relationship between the *Mendocino Coast* conditions and the RLA until Referee Ables had addressed the issue.[26] We need not characterize the Commission's statement, however, for even if appellant's position were accurate, the result would only be that the Ables award would more probably amount to final agency action, not that jurisdiction would lie in the district court.

For the reasons set forth herein, the dismissal of the action by the district court for lack of subject matter jurisdiction is

*Affirmed.*

---

**26.** Recently, in *Brotherhood of Locomotive Engineers v. ICC,* 808 F.2d 1570 (D.C.Cir.1987), we held that the Commission properly dismissed a complaint by a union on the ground that arbitration was the exclusive means of resolving a dispute arising under the *Norfolk and Western* conditions. The Commission has now expressed its further view that it may review such an arbitral award. *See supra* note 13.

In addition, the Commission has in dictum anticipated the probable outcome of any future review by it of the arbitral decision that the UTU seeks to attack here. *See Maine Central R.R., et al.—Exemption,* decision served September 13, 1985, Finance Docket No. 30532, *affirmed sub nom., Railway Labor Executives' Ass'n v. ICC,* 812 F.2d 1443 (D.C.Cir. March 16, 1987). In *Maine Central,* the Commission rejected the UTU's argument that the Washington Job Protection Agreement, an industry-wide contractual set of employee protective conditions, could be invoked to trump the *Mendocino Coast* conditions. In so holding, the Commission stated that an argument based on the RLA rather than that Agreement would also fail, because "[t]he provisions of RLA are subsumed in the conditions imposed by the Commission." Finance Docket No. 30532.